The Honorable S. Kate Vaughan

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR24-164 |
| Plaintiff, | |
| | UNITED STATES' MEMORANDUM IN SUPPORT OF DETENTION MOTIONS |
| v. | |
| 1. MARQUIS JACKSON, | |
| 2. MARKELL JACKSON, | |
| 3. MANDEL JACKSON, | |
| 4. EDGAR VALDEZ, | |
| 5. KEONDRE JACKSON, | |
| 6. MICHAEL YOUNG, | |
| 7. SIR TERRIQUE MILAM, | |
| 8. TYRELL LEWIS, | |
| 9. ROBERT JOHNSON, | |
| 10. MATELITA JACKSON, | |
| 11. MIRACLE PATU-JACKSON, | |
| 12. DIYANA ABRAHA, | |
| 13. ADEAN BATINGA, and | |
| 14. TIANNA KARASTAN, | |
| Defendants. | |

## I.    INTRODUCTION

The United States respectfully submits this memorandum in support of its detention motions in this matter. This memorandum will provide a brief overview of the

investigation that led to these charges, summarize the applicable law relating to detention, and address specific facts presently known to the government relevant to the individual defendants' continued detention.

## II.    BACKGROUND OF THE INVESTIGATION

This case arose out of two separate investigations into the Jackson family drug trafficking organization (Jackson DTO) that eventually merged into one joint investigation led by the Federal Bureau of Investigation (FBI), the Drug Enforcement Administration (DEA), and other federal and local law enforcement agencies. Through source reporting, the initial FBI investigation identified Marquis Jackson as a major regional supplier of fentanyl into the Western District of Washington and elsewhere. Simultaneously, separate source reporting for the DEA identified Markell Jackson (Marquis Jackson's half-brother) as a major supplier of fentanyl pills into Lummi tribal lands and the surrounding Bellingham area.

Investigators identified Marquis Jackson as a member of the 44 Holly street gang in the Seattle, Washington area, which is a local subset of the Crips gang. Confidential sources also identified Markell Jackson as a member of the Holly Street Gang. Agents suspect that several other members of the DTO are connected to the 44 Holly street gang.

This investigation ultimately led to the use of court authorized Title III wire interceptions. In total, agents received authorization to intercept five separate telephones, with interceptions occurring between June and September 2024 as shown in the chart below:

| Target Telephone | User | Date of Order | Date Ended |
|---|---|---|---|
| TT9 – (206) 468-4885 | Markell Jackson | June 10, 2024 | July 9, 2024 |
| TT16 – (206) 939-8627 | Adean Batinga | June 10, 2024 | July 9, 2024 |
| TT18 – (206) 883-0376 | Mandel Jackson | August 5, 2024 | September 3, 2024 |
| TT19 – (206) 475-2800 | Terrique Milam | August 5, 2024 | September 3, 2024 |
| TT23 – (602) 715-6825 | Edgar Valdez | August 5, 2024 | September 3, 2024 |

//

Memorandum in Support of Detention - 2
*United States v. Marquis Jackson, et al.* / CR24-164-JNW

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

Wiretap interceptions, search warrants, and other investigative techniques revealed a massive conspiracy to distribute large amounts of narcotics, primarily fentanyl, throughout the country, including the Western District of Washington. Prior to the execution of search warrants and the arrests of defendants on the present indictment, investigators seized an estimated 825,900 fentanyl pills, 6.5 kilograms of fentanyl powder, 7.69 kilograms of cocaine, 3.3 kilograms of methamphetamine, 8 firearms, and $93,205 in United States Currency.

On September 25, 2024, the Grand Jury returned an indictment charging 13 members of the Jackson DTO with *Conspiracy to Distribute Controlled Substances* (Count1), 4 members with *Conspiracy to Commit Money Laundering* (Count 2), and 3 members with *Distribution of a Controlled Substance* (Counts 3-5).

Law enforcement conducted coordinated arrests and searches on October 2, 2024, across multiple states. During these coordinated searches, law enforcement seized additional evidence from numerous locations in Washington, Arizona, Kansas, Missouri, Texas, and Georgia. Collectively, law enforcement seized multiple additional firearms and large quantities of controlled substances.[1]

### III.    LEGAL STANDARDS FOR DETENTION

The Bail Reform Act provides that a court should detain a defendant pending trial if "no condition or combination of conditions . . . will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f).

The Bail Reform Act identifies four factors that a court should consider in analyzing detention issues: "(1) The nature and circumstances of the offense charged, including whether the offense . . . involves a narcotic drug [or] firearm…; (2) the weight of the evidence against the person ; (3) the history and characteristics of the person,

---

[1] The evidence collected is still being documented at this time. These totals are estimates.

Memorandum in Support of Detention - 3
*United States v. Marquis Jackson, et al.* / CR24-164-JNW

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

including . . . family ties, employment, financial resources, length of residence in the

community, community ties, past conduct, history relating to drug or alcohol abuse,

criminal history, and record concerning appearance at court proceedings ; and . . . (4) the

nature and seriousness of the danger to any person or the community that would be posed

by the person's release . . . ." 18 U.S.C. § 3142(g). Of these factors, the weight of

evidence is least important, and the statute neither requires nor permits pretrial

determination of guilt. 18 U.S.C. § 3142(g).

The United States typically bears the burden of showing that a defendant poses a

danger to the community by clear and convincing evidence, and it bears the burden of

showing that a defendant poses a flight risk by a preponderance of the evidence. *United

States v. Gebro*, 948 F.2d 1118, 1120 (9th Cir. 1991). However, where, as here

defendants are charged with one or more serious Title 21 offenses, the Bail Reform Act

expressly provides that:

> [s]ubject to rebuttal by the person, it shall be presumed that no condition or
> combination of conditions will reasonably assure the appearance of the
> person as required and the safety of the community if the judicial officer
> finds that there is probable cause to believe that the person committed an
> offense for which a maximum term of imprisonment of ten years or more is
> prescribed in the Controlled Substances Act (21 U.S.C. 801 *et seq*.) . . . or
> an offense under section 924(c) . . . of title 18 of the United States Code . . .

18 U.S.C. § 3142(e). The return of an indictment is sufficient to support a finding of

probable cause, triggering the rebuttable presumption. *United States v. Hazime*, 762 F.2d

34, 37 (6th Cir. 1985); *United States v. Suppa*, 799 F.2d 115, 119 (3d Cir. 1986); *United

States v. Stricklin*, 932 F.2d 1353, 1354 (10th Cir. 1991).

In a case where the presumption applies, Courts have found that the *defendant*

bears the burden of producing evidence that he does not pose a danger to the community

or risk of flight in order to rebut the presumption. *See United States v. Abad*, 350 F.3d

793, 797 (8th Cir. 2003); *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir.2001);

*//*

Memorandum in Support of Detention - 4
*United States v. Marquis Jackson, et al.* / CR24-164-JNW

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

*Stricklin*, 932 F.2d at 1354. The government retains the burden of persuasion. *Mercedes*, 254 F.3d at 436.

However, even if a defendant has met his burden of production relating to these two factors, the presumption favoring detention does not disappear. Rather, it remains a factor to be considered among those weighed by the district court. *See Stricklin*, 932 F.2d at 1354-55; *Mercedes*, 254 F.3d at 436; *United States v. Rueben*, 974 F.2d 580, 586 (5th Cir. 1992). If the presumption were to vanish once a defendant produced *some* evidence, courts would not give adequate deference to the fact that Congress has determined "that drug offenders pose a special risk of flight and dangerousness to society." *United States v. Martir*, 782 F.2d 1141, 1144 (2d Cir.1986); *United States v. Hare*, 873 F.2d 796, 798-99 (5th Cir.1989).

Finally, it is well-settled that at a detention hearing the government may present evidence by way of an evidentiary proffer sufficient to make the court aware of the defendant's role in the offense, the weight of the evidence against the defendant, and other relevant factors. *See, e.g. United States v. Salerno*, 481 U.S. 739, 743 (1987); *United States v. Winsor*, 785 F.2d 757 (9th Cir. 1986); *United States v. Cardenas*, 784 F.2d 937 (9th Cir.), *vacated as moot upon defendant's conviction*, 792 F.2d 906 (9th Cir. 1986). The statements of fact herein, which are based on the sworn wiretap and search warrant affidavits, summaries of the results of said searches and wiretap interceptions, and information obtained at the time of the defendants' arrests, is presented as such a proffer.

## IV.    INDIVIDUAL DEFENDANTS' ROLES AND CONDUCT

The following is a summary of some of the facts related to certain individual defendants related to their roles in and conduct during the conspiracy that is related to the danger they present to the community and their risk of flight.[2]

---

[2] This summary does not include all of the evidence in support of the charges in the indictment, but rather is intended to illustrate some of the conduct that the defendants engaged that supports a determination that they present

Memorandum in Support of Detention - 5
*United States v. Marquis Jackson, et al.* / CR24-164-JNW

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

## A.    MARQUIS JACKSON[3]:

According to source reporting, which was later corroborated by intercepted communications, Marquis Jackson is the leader of the Jackson DTO. Intercepts indicate that he was the main connection to the source of supply, Edgar Valdez, and that he directed other members of the conspiracy, such as Miracle Jackson and Tyrell Lewis, to pick up large shipments of narcotics on his behalf.

In October 2022, Phoenix Police officers arrested Marquis Jackson for possession of a stolen vehicle. According to law enforcement reports, when law enforcement officers initially activated their emergency lights, Marquis Jackson took off at a high rate of speed forcing law enforcement to disengage pursuit. They then used aerial surveillance to track his vehicle and executed a stop at another location. Inside Marquis' vehicle, law enforcement located three iPhones, $10,100 in cash, a gold and diamond Rolex watch, a gold and diamond necklace, and a stolen firearm. Marquis claimed the firearm was not his, but the only other person in the vehicle was a woman who claimed that she had just met Marquis in the club and that she had no idea the car was stolen nor that there was a firearm in the car. Financial records indicated that Marquis had no source of legitimate income. Thus, the use of multiple phones and possession of large amounts of cash and luxury items was consistent with narcotics trafficking.

According to Marquis' criminal history report, he was prohibited from possessing that firearm as he has multiple prior felony convictions including: 2013 King County Superior Court convictions for (1) Attempted Robbery in the First Degree, and (2) Attempted Unlawful Possession of a Firearm in the First; 2014 King County Superior Court conviction for Unlawful Possession of a Firearm in the First Degree; 2014 King

---

a danger to the community and a risk of flight. Information in this section is based on facts obtained from search warrant and wiretap applications in this investigation, seizures, observations, and other evidence gathered by law enforcement as part of the investigation. References to criminal history are based on a review of NCIC criminal history reports.

[3] Members of the Jackson family will be referred to by their first name to avoid confusion.

Memorandum in Support of Detention - 6
*United States v. Marquis Jackson, et al.* / CR24-164-JNW

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

County Superior Court conviction for (1) Drive by Shooting, and (2) Unlawful Possession of a Firearm in the First Degree (sentenced to 46 months on these three cases); and 2017 Pierce County Superior Court Conviction for Unlawful Possession of a Firearm in the First Degree (sentenced to 54 months).

In August 2024, Agents intercepted Marquis Jackson setting up a large fentanyl deal with the DTO source of supply, Edgar Valdez. On August 9, 2024, Marquis texted Valdez stating that he needed "200" referring to 200,000 fentanyl pills. He then asked Valdez to show him a photograph of the fentanyl pills. Valdez responded with a picture of his hand holding fentanyl pills. Marquis then texted Valdez "Meet here" followed by a link to the Marriot at the Phoenix hotel.

Shortly after, agents observed Marquis' sister, Miracle Jackson, and Tyrell Lewis arrived in a black Porsche with a small child. Later that evening, Valdez texted Marquis "I'm on my way," and Marquis responded, "Black Porsche." Agents then observed a black Porsche drive around to the back of the hotel and meet with a vehicle suspected of belonging to Valdez. Immediately after, Valdez texted Marquis: "I gave him the sample painting."

Later that evening, Marquis and Valdez exchanged the following text messages indicating a future deal of up to 300,000 fentanyl pills. Agent interpretations of the messages are included in parenthesis:

**Marquis**: you didn't give my sister any work [narcotics]? (Session 224)

**Marquis**: That's all [the money/valuables] I had papi (Session 225)

**Valdez:** Papi, why didn't you send me the Cartier [watch]? (Session 235)

**Valdez:** I need to check those watches (Session 236)

**Marquis**: You can check at capri jewelers were [sic] I bought them (Session 237) [***]

**Marquis**: I really need work my people need 300 [300,000 pills] out here they have cash ready but won't give it to me without product. (Session 244)

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

**Marquis**: I'll give you what I got I have no more money rn [right now] I gave all I had (Session 246)

**Marquis**: Am [sic] I have my Porsche (Session 248)

**Marquis**: Whatever it takes (Session 249)

[***]

**Marquis**: Let me know after you check the watches papi (Session 251)

**Valdez:**: Did you review the sample I left you? (Session 255)

**Marquis**: Yes they are good are they all like that? (Session 256)

Immediately after this call, agents intercepted a call between Marquis and Mandel. During the call, Marquis said: "your dumbass daughter [Miracle] just got me hit again" because she gave the "plug" "all my money and two of my watches" and only got a "fucking boat" (referring to 1,000 fentanyl pills). Later in the call, Mandel talked to a woman in the background (later identified as Matelita), "She done gave the plug all the money and two watches and got out with one boat. I know babe." Mandel asked him why he didn't have Tyrell do the deal. Marquis responded, "Tyrell was there with her. His dumbass let her get in the car." Matelita can be heard in the background saying, "She don't know what the fuck. She don't do that type of shit." Mandel asked, "How much cheese she give him?" Marquis replied, "50."

The following day, Marquis set up a deal with Valdez to bring the remainder of the pills from the prior deal. Valdez agreed. Marquis then called Mandel and told him to talk to Miracle and instruct her to go meet with the plug. Minutes later, agents intercepted a call between Mandel and Miracle during which Mandel told Miracle to "take care of business." (Session 404) A male with Miracle, presumed to be Tyrell Lewis, got on the phone and told Mandel that Miracle "doesn't want to handle this." The male told Mandel that he hadn't met with "the plug" before, but he knew the game and that they usually want to keep the "plug" away from their families.

Later that evening, law enforcement observed Valdez leave his stash house and

Memorandum in Support of Detention - 8
*United States v. Marquis Jackson, et al.* / CR24-164-JNW

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

drive to the Marriott. As soon as he arrived, he texted Marquis: "I'm here." Marquis called Valdez a couple minutes later telling him that his sister (Miracle) was coming down. Around this time, investigators inside the hotel observed Miracle and Tyrell exit the hotel, enter the Black Porsche, and drive to the back of the hotel parking lot near Valdez' sedan. Shortly after, agents observed the Porsche return to the hotel parking lot and Tyrell and Miracle take a black roller suitcase they didn't have before up to their hotel room. Agents believe Miracle and Tyrell then counted the pills in the room because



15 minutes later, Marquis texted Valdez: "That's only 100 papi" followed by a second text: "I need 2." Ten minutes later, Tyrell and Miracle left the hotel with the roller suitcase. Shortly after, law enforcement stopped their vehicle and obtained a warrant to search their vehicle. Inside the vehicle, law enforcement found the roller suitcase which contained 100,000 fentanyl pills.

An hour later, law enforcement intercepted a call between Marquis Jackson and Mandel Jackson where they discussed whether this was a set up. Marquis told Mandel that they facetimed him while they were in the room counting the drugs and there was

Memorandum in Support of Detention - 9
*United States v. Marquis Jackson, et al.* / CR24-164-JNW

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

only 100 instead of 200 (referring to 100,000 pills instead of 200,000). (Session 425) Agents sent the fentanyl pills to the DEA laboratory, which indicated that the fentanyl pills tested positive for p-Flurofentanyl (a fentanyl analogue) with a combined weight of 10.9 kilograms.

The investigation suggests that Marquis was armed with firearms. As discussed above, in 2022, Agents stopped Marquis in a stolen vehicle with a stolen firearm. Additionally, on August 20, 2024, Agents intercepted a call between Marquis and Mandel Jackson where they discussed attempting to get Marquis an unregistered firearm during his trip to Chicago. Mandel said that he talked to his cousin, but "all his (firearms) are in his name. He has to call his little cousin, they in the streets, he gonna grab one from him. His are all registered." (Session 1286). Later in the call, Mandel confirmed that he was going to make calls on Marquis' behalf to get him "a little gleazy (a glock) or something." Mandel's wife Matelita is in the background talking to them during this portion of the call.

On October 2, 2024, law enforcement arrested Marquis in a residence in Atlanta, Georgia. Inside the residence, law enforcement also located Harold Butler (a known DTO redistributor) along with eight other individuals. When they searched the residence, law enforcement found four or five firearms.

## B.    MARKELL JACKSON & DIYANNA ABRAHA:

Markell Jackson led the Bellingham distribution network of the Jackson DTO. Abraha is Markell's girlfriend and assisted him by making travel arrangements, coming with him on drug deals, and laundering drug proceeds on his behalf. Law enforcement conducted numerous controlled buys into Markell using an undercover agent (UC). On October 31, 2023, the UC bought 5,000 fentanyl pills for $4,000. Pursuant to the DEA laboratory, those pills weighed 540.8 grams and tested positive for p-Fluorofentanyl. The deal took place in the UC's vehicle, but Abraha was present in Markell's vehicle during the deal. On December 7, 2023, the UC bought 5,000 pills for $4,000 from Markell.

Memorandum in Support of Detention - 10
*United States v. Marquis Jackson, et al.* / CR24-164-JNW

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

During the deal, Markell also indicated that he could get powdered fentanyl. Again, Abraha was in Markell's vehicle while the deal took place in the UC's vehicle.

Immediately following this controlled buy, agents followed Markell and Abraha to another location where they observed Robert Bellair enter their vehicle for a short period of time and exit with a small container. Agents followed Bellaire's vehicle and pulled him over. Inside Bellaire's vehicle, law enforcement recovered 6,500 fentanyl pills. On September 30, 2024, Magistrate Judge S. Kate Vaughan signed an arrest warrant and a complaint charging Robert Bellair with Possession with Intent to Distribution Fentanyl.

Most of these controlled buys took place near the Lummi tribal reservation. Agents also identified Markell as the main supplier to four known drug dealers on the Lummi tribal reservation. During the time that Markell distributed fentanyl into the Lummi tribal reservation, the Lummi tribe saw a dramatic increase in fentanyl related overdoses. In September 2023, four tribal citizens died of fentanyl overdoses within a four-day period. On one of the decedent's phones, law enforcement observed text messages in the month prior to the overdose where the decedent obtained Markell's number. The phone also showed communications between the decedent and Bellair only four days before the overdose where the decedent again attempted to get in touch with Markell. Since the overdose, law enforcement has repeatedly observed Bellair driving around in that decedent's vehicle.

Markell sold fentanyl pills to the UC on multiple other occasions. On March 7, 2024, Markell sent Adean Batinga and Robert Johnson as couriers to sell the UC 5,000 fentanyl pills for $5,000; on March 18, 2024, Markell sold the UC 5,000 pills for $5,0000; and on June 12, 2024, Markell sold the UC 10,000 pills for $8,500 (agents later learned that this deal included 1,000 fentanyl pills and 9,000 sham pills).

For many of these deals, Abraha set up travel accommodations for Markell. For example, on April 25, 2024, Markell attempted to cross into Canada with $10,555 in cash before being turned back by Canadian border patrol. Financial records and iCloud

Memorandum in Support of Detention - 11
*United States v. Marquis Jackson, et al.* / CR24-164-JNW

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

messages between Markell and Abraha show her booking him a hotel in Vancouver that night. Financial records also show Abraha booking multiple hotels in the Bellingham area for Markell.

Abraha also helped launder Markell's money. On February 20, 2024, Abraha made four ATM cash deposits totaling $50,050 which she withdrew that same day. Additionally, she made at least six large scale cash exchanges at various banks for amounts just under the $10,000 reporting requirement. Agents believe these were attempts at structuring the cash amounts to avoid bank reporting requirements. In addition to accompanying Markell on several drug deals, they also openly discussed drug trafficking. For example, on June 23, 2024, Markell told Abraha that he was on his "last juug" which is common street vernacular for a drug deal.

According to TIII intercepts, Markell Jackson was armed with firearms. On June 14, 2024, investigators intercepted a call between Markell and an unidentified male. During the call, Markell agreed to provide the unidentified male .40 caliber bullets for his "gen5" (a Glock pistol) in exchange for a gun. On August 19, 2024, Markell called Mandel to ask if his Glock was at the residence. And on August 29, 2024, Mandel called Markell to see if he had a pistol that he could provide someone. Markell told Mandel, "we only got chops" (a reference to rifle style firearms) and then asked Mandel, "where my Glock at?" Agents obtained a search warrant for Markell's iCloud account, which included an image attachment of what appeared to be a short, barreled rifle, and a text message from Robert Johnson that stated: "Same n**** trynna trade you 23 wit beam (a Glock 23 pistol) & 22 stick (an extended magazine) for your 19 (a Glock pistol) … it's gen 3 tho." These intercepts indicate that Markell was often armed with a firearm.

On October 2, 2024, law enforcement executed a search warrant on Abraha's residence, but she was not present. Law enforcement discovered that she was staying at a local hotel within the radius of her GPS phone pings. Phone tolls showed multiple incoming calls to her phone just after agents executed simultaneous nationwide warrants

Memorandum in Support of Detention - 12
*United States v. Marquis Jackson, et al.* / CR24-164-JNW

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

at 4:00 AM Pacific Standard Time. Shortly after, Abraha's phone pings indicated that she left the hotel and drove towards the residence of Mandel and Matelita Jackson. Around the time her phone pings arrived at Mandel and Matelita's residence, the search team saw an Acura drive by, roll down the window, and Markel Jackson leaned out and yelled: "Did you find what you were looking for?" Immediately after, Abraha turned off her phone to eliminate any GPS pings, so agents were unable to locate her. Based on this information, agents believe that Abraha knows she is currently wanted by law enforcement and is actively attempting to evade detection.

## C.    MANDELL JACKSON & MICHAEL YOUNG:

Agents identified as a long-time gang member of both Deuce 8 and State Street Crips. Mandel served as the consigliore/advisor for the Jackson DTO, he stored firearms and drugs at his residence, and he also planned his own large scale drug deals. Michael Young appears to be the leader of another DTO that partners with the Jackson DTO and specifically conspired with Mandel to set up large purchases of controlled substances.

Intercepts reveal that Mandell set up large scale drug deals on behalf of the DTO and that he was in constant communication with his sons (Marquis and Markell) regarding the Jackson DTO drug trafficking. As described above, Mandell served as a go-between for Marquis and Miracle during the 100,000 fentanyl pill seizure that took place on August 10, 2024 and was the one to order Miracle to "take care of business" when she didn't want to follow through with the drug deal.

Additionally, in a series of intercepted calls between Mandel and Michael Young, they compared prices of their respective drug suppliers and discussed going in together on a large-scale purchase of narcotics. On August 6, 2024, Young asked Mandel if he would talk to his "weeples" (slang for "your people," which referred to Marquis and Markell) and clarified that he was not talking about the "freeway ricky ross (cocaine) either." Mandel clarified, "the fendys" (a reference to fentanyl pills). Young replied, "yeah." Mandel told Young that he was getting fentanyl for 25 cents per pills, and Young

Memorandum in Support of Detention - 13
*United States v. Marquis Jackson, et al.* / CR24-164-JNW

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

replied that his people were paying between 32 and 34 cents per pill. Mandel promised to let Young know if he was able to put "something together" (a reference to setting up a drug deal). Young replied, "yeah, let me know."

On August 9, 2024, Mandel asked Young how much his people were charging for "smurfs" (a common term for blue fentanyl laced m30 pills). Young said, "33 for 100." Young then bragged about how he was going "to go 'wang' them over the head with this bread," which was a reference to a large-scale drug deal that he currently had set up. Mandel then suggested that he and Young go in together to "make one big play." Young agreed and Mandel promised to call him back.

On August 26, 2024, Mandel asked Young if he had found those "cool smurfs" and told him that his boys (referring to Marquis and Markell) were messing with "fendybelts." The two of them then compared pricing. Unbeknownst to Mandel, shortly after this call, agents arrested his source of supply, Edgar Valdez, thereby cutting off the Jackson DTO's supply of fentanyl pills. But Mandel and the Jackson DTO quickly found a new supplier. On September 2, 2024, Mandell called Young to tell him they "just found a new line (supplier), so, running it back up." These intercepts show that Mandel and Young both served as high-ranking members in their respective DTOs and that they conspired together on pricing and planned on going in together on a large purchase of narcotics.

//

//

On May 25, 2023, a Fed ex Shipping Hub in Phoenix conducted an administrative search that revealed a packaged sent by "Michael G. Young Jr." with Young's number listed as a contact number contained 70,000 fentanyl pills. The pills were packaged in two large protein powder containers. The use of protein powder containers to disguise fentanyl pills during transport were a common tactic of Jackson DTO members, thereby further cementing Michael Young's connection to the Jackson DTO.

 

In addition to conspiring with Michael Young, Mandel made other deals on behalf of the DTO. For example, On August 20, 2024, Agents intercepted a conversation between Mandel and Chad Conti where Conti noted that several of his customers had complained about a recent batch of pills. Mandel apologized and explained, "we be grabbing a gang of them at a time [buying pills in pulk], not just a .. you know what I'm saying… like 100 [100,000 pills]." Conti agreed with Mandel that it is hard to check quality when you are buying in bulk. Conti told Mandel that he wanted to continue buying from him because he had been buying from him for three years without any prior issues. This call shows that Mandel is part of large-scale drug purchases and that he has regularly been distributing controlled substances on behalf of the DTO for at least three years.

Memorandum in Support of Detention - 15
*United States v. Marquis Jackson, et al.* / CR24-164-JNW

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

Additionally, Mandel appears to have stored controlled substances and guns for the DTO at his residence. For example, on August 8, 2024, agents intercepted a call between Mandel and Markell where they discussed a disputed count of narcotics and Mandel said, "there was 6 extra in the pack when I counted them." Later in the call, Mandel described that he had been nervous about keeping stuff at the house because he had seen some suspicious vehicle and he told Markell "everything that was in there, I just gave it to dude. I passed that sh** off. Get it on up out of here."

Intercepts also indicate that Mandel both stored firearms for DTO members and was armed with a firearm himself. As described previously, two intercepts indicated that Markell left his "Glock" at Mandel's residence. Additionally, on August 29, 2024, Mandell called Markell and told him that a female called and told him, "I need a pistol, somebody just killed my brother last night." Mandel told Markell that he "only got one [a gun], the one I carry right now" and that he did not have an extra gun for her.

Intercepts indicate that Mandell and Marquis know of the deadly effects of fentanyl. On August 27, 2024, agents intercepted a call between Mandel and Marquis where they mourn the overdose death of a close friend. But later in the call, Mandel asked Marquis if he found another supplier and Marquis replied, "yeah we back on." So even when confronted with the deadly effects of fentanyl, they continued to sell it.

Michael Young has a lengthy criminal history including the following: 2006 King County Superior Court (cause number 06-1-07224-0) convictions for (1) Possession with Intent to Distribute Controlled substances, and (2) Unlawful Possession of a firearm; 2008 King County Superior Court (cause number 08-1-02767-4) conviction for Possession with Intent to Distribute Controlled Substances; 2011 King County Superior Court (cause number 08-1-11944-7) conviction for Escape in the Second Degree; and 2015 King Count District Court conviction for Assault in the Fourth Degree – Domestic Violence.

On October 2, 2024, law enforcement executed a warrant at Mandel's residence.

Memorandum in Support of Detention - 16
*United States v. Marquis Jackson, et al.* / CR24-164-JNW

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

Inside, law enforcement found a backpack containing a firearm and a large quantity of weed. Based on prior intercepts from Mandel describing carrying a firearm and selling marijuana, law enforcement believes this firearm is likely connected to Mandel. Additionally, law enforcement found an estimated 2,000 fentanyl pills in the garage.

That same day, law enforcement executed a warrant on a residence where Michael Young was staying. Inside, law enforcement found several firearms, but they could not connect them directly to Young and they may have been owned and possessed lawfully by the homeowner. Additionally, law enforcement found 186 grams of unidentified narcotics.

## D. EDGAR VALDEZ

Edgar Valdez was the supplier of fentanyl pills for the entire Jackson DTO. According to intercepted communications, he regularly supplied the DTO with hundreds of thousands of fentanyl pills including the 100,000-fentanyl pill deal described above and at least one 200,000 pill sale to Keondre Jackson described in more detail later in this memorandum.

//

//

Memorandum in Support of Detention - 17
*United States v. Marquis Jackson, et al.* / CR24-164-JNW

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

On August 18, 2024, Agent served a federal warrant to search Valdez' residence and stash house. At his residence, Agents located nearly 2,000 fentanyl pills, two Rolex watches, a gold chain, and $25,000 in United States Currency. At the stash house, law enforcement located a black Ruger firearm, a money counter, 1,774 grams of powdered fentanyl, 2.5 kilograms of methamphetamine, and 37 kilograms of fentanyl pills. A hollowed-out tire found in the stash house seemed to indicate that the DTO transported the drugs using tires filled with narcotics:

 



//
//

Memorandum in Support of Detention - 18
*United States v. Marquis Jackson, et al.* / CR24-164-JNW

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

**E.    KEONDRE JACKSON:**

Keondre Jackson served as a large-scale redistributor and drug purchaser for the Jackson DTO. Law enforcement first identified Keondre based on concerning June 19, 2024 intercepted call to Markell where Keondre (then an unidentified male) said: "Here I come, brother, we done got into it, we done mashed a n**** on them…. Yeah, on God we just did a n**** bad."

Concerned that this call referenced a potential shooting,[4] law enforcement obtained a warrant for the iCloud account related for the phone number from the call, which identified Keondre as the owner of the account based on the account's e-mail address (keondre.jackson24@gmail.com), numerous selfies, and photographs of airline tickets in his name. The account also established Keondre's connection to the DTO based on numerous videos of Keondre engaged in luxury shopping with Marquis Jackson and saved rap lyrics where Keondre describes selling drugs with his cousin "bounce," which is the known moniker for Marquis Jackson. One of the many selfie style photographs on Keondre's phone showed him holding large amounts of cash next to a firearm with an extended magazine. Agents also located a note on Keondre's phone with a description of a gun matching the gun in the photograph below.



---

[4] Law enforcement later discovered that this call referred to a bar fight rather than a shooting.

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

The account also contained several text messages with the Jackson DTO supplier, Edgar Valdez, where Keondre set up large drug deals on behalf of the Jackson DTO. For example, on June 15, 2024, the following SMS text message exchange between Keondre and Valdez indicate that Keondre purchased 180,000 fentanyl pills for $58,400:

**Keondre**: 58,400

**Valdez**: Daddy, it will be 200. Do you have the money for 200?

**Keondre**: Okay I'm here

**Valdez**: red jeep

**Keondre**: Thank you papi

**Keondre**: Missing 20k papi… Papi these are no good… Can you come back?

**Valdez**: because they are bad daddy

**Keondre**: I know papi but they are bad like the last time… I just want the money back papi this is bad work

**Valdez**: Daddy, it's just dust, take it off, I'll give you 2k more free for that dust.

**Keondre**: No papi they won't sell papi we took a loss last time with ones like these can't take a loss like that again "

**Valdez**: Ok, come back or do you want them already

**Keondre**: I want them papi if you do the 5 next time

**Valdez**: Daddy you gave me money for 176 and I gave you 180

These SMS messages indicate that Keondre bought drugs from Valdez several times. On June 20, 2024, Keondre texted Valdez "Come back with the 20 papi I want them. Valdez replied, "Next time are you going to pay me the 60." On June 30, 2024, Valdez and Keondre texted about meeting up. On July 3, 2024, Keondre texted, "Got the 50 we owe for you [sic] right now papi whenever you're ready."

//

//

Memorandum in Support of Detention - 20
*United States v. Marquis Jackson, et al.* / CR24-164-JNW

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

On July 4, 2024, Valdez sent Keondre the following picture of a large box of fentanyl pills. Keondre then asked, "Can you bring another 200 papi and I give you 20k…and the rest when I get back…30k."



## F.    SIR TERRIQUE MILAM:

Sir Terrique Milam served as a drug redistributor for Markell on behalf of the Jackson DTO. Agents intercepted Milam's line, which revealed numerous street level drug deals outlining his role as a redistributor for Markell. These communications also indicate that Milam was in Markell's trusted circle and that he worked closely with Markell. In August 2024, law enforcement intercepted communications between Markel and Milam where they discussed using female couriers to send "ghost bags" filled with narcotics over commercial airlines. Agents also intercepted numerous interceptions where Markell told Milam when and where he was conducting drug deals.

Markell recruited Milam to partner with him on a major drug purchase. On June 24, 2024, investigators intercepted Markell texting with Valdez to set up a purchase of

Memorandum in Support of Detention - 21
*United States v. Marquis Jackson, et al.* / CR24-164-JNW

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

150,000 fentanyl pills.[5] Less than 30 minutes later, agents intercepted a call between Markell and Milam where Markell tells Milam about the deal and that he is getting on a flight that night. Markell asked Milam to meet him there the following morning to help with the deal and told him that they could buy pills for 33 cents each. Markell then said, "we're just gonna re-up and keep flipping and then keep flipping, keep flipping." Milam agreed to help Markell with the drug deal and the two then discussed how Milam could charge 40 to 50 cents per pill and make a lot of money off the deal.

Intercepted communications indicate that Milam also engaged in interstate prostitution. On August 10, 2024, Milam received a message from an unidentified female who told him about a man with "hella money" who asked what she could do, and she told him that "she could do full service." On August 11, 2024, Milam exchanged a series of text communications with one of his prostitutes where he told her, "I don't 'treat you like a human' because you don't treat me like I'm daddy (a pimp) simple." She replied, "you're right" and "You good." Milam then said, "Just keep it I don't need a funk 200 dollars here and there you're a lostitute[6] who's halfway hoeing."

//

//

---

[5] Agents are unsure of whether this deal ever took place.
[6] Lostitute is a slang term for a prostitute who does tricks just to pay the cable bill.

Memorandum in Support of Detention - 22
*United States v. Marquis Jackson, et al.* / CR24-164-JNW

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

Milam was armed while he trafficked narcotics. In late August 2024, law enforcement intercepted communications indicating that Milam was making a trip to eastern Washington in a rental car for what appeared to be a drug run. As Milam made his way back, law enforcement conducted a traffic stop on Milam's vehicle. Law enforcement obtained a warrant to search the vehicle after a drug canine alerted to the presence of narcotics in the vehicle. Inside, law enforcement didn't find any narcotics, but they did find a loaded handgun as depicted below.



Following the seizure, law enforcement intercepted Milam telling an unknown male that he had been pulled over by police. He told the unidentified male, "I yanked the shit (drugs) out of it though" indicating that there were drugs in the vehicle even though law enforcement didn't find any when they searched the vehicle.

According to Milam's criminal history report, he was convicted in 2024 out of King County Superior Court cause number 23-1-05424-1) for (1) Promoting Prostitution in the Second Degree, and (2) Unlawful Possession of a Firearm in the Second Degree; and has convictions from 2022 out of King County Superior Court cause number 22-1-04256-3 for (1) Reckless Endangerment, and (2) Assault in the Fourt Degree.

Memorandum in Support of Detention - 23
*United States v. Marquis Jackson, et al.* / CR24-164-JNW

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

### G.    TYRELL LEWIS & MIRACLE PATU-JACKSON:

Tyrell Lewis & Miracle Patu-Jackson served as couriers for Marquis on a 100,000 pill fentanyl deal. They first met with Edgar Valdez on August 9, 2024 to pick up samples. Marquis got mad at Miracle because she provided Valdez the entire buy money ($50,000) for just the shipment, which indicates that Miracle had not been engaged in drug trafficking for an extended period. Before the subsequent 100,000 pill deal, Mandel called Miracle to tell her to "take care of business." Tyrell got on the phone and told Mandel, "I'm not about to let her handle this situation again." He told Mandel, "I know the game… usually we want to keep the plug away from our family and our sisters." These calls indicate that Miracle was new to drug trafficking, but Tyrell had been involved in drug trafficking for some time.

### H.    ROBERT JOHNSON & ADEAN BATINGA:

Robert Johnson and Adean Batinga served as a redistributor for the Jackson DTO. Both were present in the vehicle during the March 7, 2024 controlled purchase of 5,000 pills. They used Batinga's phone and vehicle, but Robert Johnson provided the drugs to the UC in exchange for the money. Agents intercepted Batinga's phones which revealed frequent street level drug transactions.

Intercepts regarding Robert Johnson showed that his residence served as a central meeting place and likely stash house for DTO members. Agents intercepted multiple calls where Markell described needing to stop by "Rob's house" to either pick up money or drugs. Additionally, law enforcement observed an apparent drug transaction right outside of Robert Johnson's house. On June 10, 2024, law enforcement intercepted Markell tell Milam, "I'm in Renton, still bussin this juug." Shortly after, law enforcement observed Markell parked in front of Robert Johnson's house with Robert Johnson talking to the driver of a red Cadillac. Minutes later, agents intercepted a follow up call where Markell told Milam, "I'm already here, brother. I already served em." Milam asked, "Where?" Markel replied, "In the red Cadi. Right in front of you."

Memorandum in Support of Detention - 24
*United States v. Marquis Jackson, et al.* / CR24-164-JNW

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

Additionally, as discussed previously, intercepts indicate that Robert Johnson was armed with a firearm. In the August 29, 2024 call between Mandel and Markell, Mandel asked if Markell or Rob had any guns, and Markell replied, "we only got chops" which infers that both Markell and Rob were armed with rifle style weapons. As described previously, Robert Johnson also discussed a potential trade of pistols between Markell and another DTO associate.

On October 2, 2024, agents served a warrant on Robert Johnson's residence where they arrested both Robert Johnson and Adean Batinga. Inside Robert Johnson's bedroom, law enforcement found an AK-variant pistol that appears to be consistent with the prior call between Mandel and Markell where Markell indicated that he and Robert Johnson had "chops."



UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

**I.    MATELITA JACKSON:**

Matelita Jackson is married to Mandel Jackson and the mother of Marquis Jackson and Miracle Patu-Jackson and the step-mother to Markell Jackson. Agents intercepted her in the background of communications between Mandel and Marquis Jackson both before and after the 100,000 fentanyl pill deal with Valdez. Matelita mainly assisted the Jackson DTO by helping launder their money both through structured deposits and using her account as a "pass-through" account between Marquis and Markell Jackson and other members of the DTO. Matelita has lengthy ties in the community and no prior criminal history.

**J.    TIANNA KARASTAN:**

Tianna Karastan served as a courier for the Jackson DTO. On January 12, 2023, Delta airlines contacted Phoenix PD regarding a suspicious bag. Inside the bag, law enforcement found three whey protein containers (consistent with both the Michael Young package and the 6,500 pills seized from Robert Bellair) containing 4.85 kilograms of fentanyl pills. Airport surveillance footage shows Tianna Karastan checking in the suitcase and then leaving the airport. Agents then obtained flight records showing that Karastan made at least 18 flights between Phoenix and Seattle from April 2022 to January 2023. Agents also uncovered financial payments from Matelita Jackson to Tianna Karastan in the days immediately before and after her January 12th flight.



Memorandum in Support of Detention - 26
*United States v. Marquis Jackson, et al.* / CR24-164-JNW

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

# V.   CONCLUSION

For the reasons set forth above, the government respectfully submits that Marquis Jackson, Markel Jackson, Mandel Jackson, Edgar Valdez, Keondre Jackson, Sir Terrique Milam, Tyrell Lewis, and Robert Johnson are unable to overcome the presumption against detention that applies to this matter and should therefore be detained pending trial.

DATED this October 2, 2024.

Respectfully submitted,

TESSA M. GORMAN
United States Attorney

*/s/ Zachary W. Dillon*
ZACHARY W. DILLON
Assistant United States Attorney
1201 Pacific Ave., Suite 700
Tacoma, WA 98402
Telephone:   (253) 428-3800
E-mail:        Zachary.Dillon@usdoj.gov

Memorandum in Support of Detention - 27
*United States v. Marquis Jackson, et al.* / CR24-164-JNW

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800